IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )   Criminal No. 06-167 |
| | ) |
| MICHAEL MENDOZA, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

CONTI, District Judge.

Defendant Michael Mendoza ("Mendoza" or "defendant") was indicted on May 5, 2006, on one count of conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine on or about May 2005, and continuing thereafter until December 2005, in violation of 21 U.S.C. § 846. Defendant filed a pretrial motion with this court on September 19, 2006. In his pretrial motion, defendant raised six suppression issues related to his detention and arrest. The government filed a response to this motion on October 22, 2006 and a supplemental response to defendant's motion to suppress evidence and statements on March 5, 2007. A suppression hearing was held on March 12, 2007.

At the hearing on defendant's motion for suppression, the court addressed the following arguments: 1) whether the traffic stop of defendant's vehicle was made without reasonable suspicion; 2) whether the searches of defendant's person, vehicle and residence were conducted pursuant to a valid consent; and 3) whether statements made by defendant were as a result of a custodial interrogation and in violation of defendant's Miranda rights. Essentially, although six issues were raised by defendant in his motion to suppress evidence, there were three main thrusts of defendant's arguments: whether there was reasonable suspicion to initiate the traffic stop of defendant's vehicle; whether statements made by defendant were in violation of defendant's

Miranda rights; and whether the consents to search his person, his vehicle and his residence were voluntary and, thus, valid.

The court heard testimony from Special Agent Brett Pritts, Task Force Officer Edward Walker and Task Force Officer Robert Veinovich. After hearing testimony and argument from counsel for both defendant and the government, the court ruled on two of defendant's challenges. Among other things, the court found that the government proved by a preponderance of the evidence that there was reasonable suspicion that criminal activity was afoot. Therefore, the patdown search of defendant was proper. The court also found that statements made by defendant following the initial traffic stop and the subsequent arrest of defendant were made after defendant was advised of his Miranda rights. The court found that these statements would not be suppressed. The only remaining issue relates to whether the handcuffing of defendant invalidated the verbal and written consents given for the search of defendant's person, vehicle and residence.

After the suppression hearing, defendant and the government each submitted proposed findings of fact and conclusions of law regarding whether defendant's consents to search his person, his vehicle and his residence were valid.

On this 20th day of June 2007, the court makes the following findings of fact and conclusions of law with respect to the remaining issue raised in defendant's motion to suppress evidence.

**I.      Findings of Fact**

1.      On January 5, 2006, law enforcement officers conducted surveillance on a home located

at 1213 Spring Garden Avenue (the "Spring Garden residence"). (Tr.12)[1]. Law enforcement officers knew the Spring Garden residence was a "stash house" for illegal narcotics because a confidential informant had previously purchased narcotics from the Spring Garden residence. (Tr.10-11 ). During the surveillance, officers saw defendant leave the Spring Garden residence and drive away in a vehicle that bore a Texas license plate. (Tr. 12 ). Task Force Officer Walker ("Walker") followed defendant when defendant left the Spring Garden residence. (Tr. 45 ). Defendant went to a different residence, located at 1108 Province Street, and emerged from the residence with a large plastic garbage bag. (Tr.13, 54 ). Defendant returned to his vehicle with the bag and proceeded driving through the North Side section of the City of Pittsburgh. (Tr. 54 ).

2.  Less than one hour after defendant left the Spring Garden residence, a confidential informant entered the Spring Garden residence and purchased one kilogram of cocaine from two members of a drug trafficking organization in a second controlled purchase. (Tr.12). The confidential informant had previously executed a controlled purchase of a large amount of cocaine from the same two individuals, at the same location. (Tr. 8). The two individuals had previously informed the confidential informant that their cocaine source of supply was from Texas. (Tr. 12).

3.  After the confidential informant made the controlled purchase, the two individuals were arrested by law enforcement officers. (Tr. 13). Immediately following the arrest, law enforcement officers executed a search warrant on the Spring Garden residence and

---

[1] For ease of reference, the court refers to the transcript of the March 12, 2007 suppression hearing using the internal pagination of the transcript.

|   |   |
|---|---|
|   | discovered approximately six kilograms of cocaine and other drug trafficking materials. (Tr. 13-14). |
| 4. | Upon discovering the cocaine and other drug trafficking paraphernalia, law enforcement officers notified Walker and advised him of the results of the search. (Tr. 14).  Walker immediately initiated a traffic stop of defendant's vehicle. (Tr. 45). The traffic stop of defendant's vehicle occurred at approximately 6:50 p.m.  (Tr.45 ). Walker approached the vehicle with his weapon drawn and ordered defendant out of the vehicle. (Tr.46 ). Defendant complied with Walker's instructions.  (Tr.46 ). Shortly after Walker stopped defendant's vehicle, back up officers, Task Force Officers Jeffrey Brautigam ("Brautigam"), Rick Szurley ("Szurley") and Daniel Soroczak ("Soroczak"), arrived to assist Walker.  (Tr.47 ).  Once the backup officers arrived, Walker holstered his firearm and asked defendant to accompany him to the rear of the vehicle.  (Tr.47-48 ).  Defendant complied with Walker's request.  (Tr.48 ). Walker's tone of voice and interaction with defendant were cordial and professional.  (Tr. 48).  Walker's weapon was drawn for approximately ten seconds.  (Tr.72 ). |
| 5. | Upon reaching the back of defendant's vehicle, approximately one minute after defendant exited his vehicle, Walker conducted a patdown search of defendant's person.  (Tr. 48, 73).  Walker asked defendant if he would mind emptying the contents of his pockets onto the roof of the car. (Tr. 49, 71-72). Defendant agreed to do so and emptied his pockets onto the car. (Tr. 49).  Brautigam retrieved defendant's identification from his wallet and informed Walker of defendant's name. (Tr. 49). Upon hearing defendant's name, Walker remembered defendant from a previous arrest and conviction involving possession of one |

          kilogram of cocaine.  (Tr. 49-50).

6. Thereafter, defendant was handcuffed behind his back.  (Tr. 50, 62).  Walker informed defendant that he was being handcuffed for officer safety.  (Tr. 50).  Walker also informed defendant that he was not under arrest but that he was being detained as part of an on-going investigation.  (Tr. 50, 68).

7. Five minutes after initiating the traffic stop, at approximately 6:55 p.m., Walker read defendant his <u>Miranda</u> warnings.  (Tr. 51, 74).  Defendant acknowledged that he understood his rights and agreed to speak with the officers.  (Tr. 51-52).  Defendant did not appear to be nervous but instead was "casual, cordial and friendly." (Tr. 51).

8. Following defendant's waiver of his Miranda rights, Walker asked defendant if he could search his car.  (Tr. 52).  Defendant gave verbal consent to search his vehicle.  (Tr. 52).  The officers then requested defendant's permission to move his vehicle out of the busy intersection in which the vehicle was located.  (Tr. 52).  Defendant agreed to allow the officers to move his vehicle out of the intersection (Tr. 52).  The vehicle was still in the defendant's view.  (Tr. 52).  There was a short delay when moving the vehicle because the officers had to decide who would move the vehicle.  (Tr. 52).  Eventually, Soroczak moved defendant's vehicle out of the intersection. (Tr. 52).  Prior to conducting the search, Walker completed and read to defendant a Pennsylvania State Police "Waiver of Rights and Consent to Search" form.  (Tr. 52-53).  The form stated:

> I have been told that I do not have to give my consent.  I understand that I have the right to refuse this request and that the police may not be able to conduct this search without a search warrant unless I give my consent.  Nonetheless, I voluntarily give my consent to the police to conduct this search.

|   |   |
|---|---|
|   | (Government Exhibit ("Ex.") 2). The consent form continued by noting that "[n]o one, including anyone from the Pennsylvania State Police or any other police officer, has threatened me in any way, nor has anything been promised to me in return for giving my consent to conduct this search." Id. Defendant indicated that he understood his rights. (Tr. 53, 75). The officers removed the handcuffs from defendant and defendant signed the Waiver of Rights and Consent to Search form. (Tr. 53, 75). Defendant signed the form at 7:01 p.m. (Ex.2; Tr. 75). After defendant executed the form, he was again handcuffed but with his hands in the front. (Tr. 62). |
| 9. | The officers conducted a search of defendant's vehicle and seized a number of items. (Tr. 53). After the search, the officers questioned defendant about the large garbage bag with which he was seen leaving his apartment. (Tr. 54). Defendant denied leaving his apartment with a garbage bag. (Tr. 54). Walker was concerned that defendant may have had a trap in his car that was concealing the garbage bag. (Tr. 54). Walker, therefore, requested a Pittsburgh Police Narcotics K-9 to search the vehicle. (Tr. 54-55). The dog arrived shortly after being called to the scene and performed a search of defendant's vehicle. (Tr. 55, 63). The Pittsburgh Police Norcotics K-9 officer indicated that defendant's vehicle was "clean". (Tr. 55). The search of the defendant's vehicle by the officers and the dog lasted approximately twenty to thirty minutes. (Tr. 75-76). |
| 10. | Immediately following the search of defendant's vehicle, Walker asked defendant if he could search defendant's residence. (Tr. 56). Defendant verbally consented to the search of his residence. (Tr. 56). Defendant accompanied Walker to his residence in Walker's vehicle. (Tr. 56). |

11. Upon arriving at defendant's residence, Walker read defendant a USDOJ/DEA "Consent to Search" form. (Tr. 56). The Consent to Search form provided "I have not been threatened, nor forced in any way" and "I freely consent to this search." (Ex. 3). Defendant indicated that he understood the form and agreed to sign it. (Tr. 56). The handcuffs were removed from defendant and he signed the form. (Tr. 56). Defendant signed the USDOJ/DEA Consent to Search form at 8:04 p.m. (Ex. 3; Tr. 56). The officers conducted a search of defendant's residence but found no contraband. (Tr. 57). Thereafter, Walker took defendant to Pittsburgh Police headquarters. (Tr. 58,78). Defendant arrived at Pittsburgh Police headquarters at approximately 8:45-9:00 p.m. (Tr. 58,75).

12. During the entire search, officers did not raise their voices in a threatening manner or attempt to physically intimidate defendant. (Tr. 55, 57). Defendant's demeanor during the searches remained cordial and friendly. (Tr. 55). Defendant also made small talk with the officers concerning playing basketball. (Tr. 55, 70).

**II.    Conclusions of Law**

**Defendant voluntarily consented to a search of his person, his vehicle and his residence.**

1. As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). Once the defendant establishes a basis for his motion, the burden shifts to the government. Id.

2. The Fourth Amendment to the United States Constitution provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated[.]"  U.S. Const.Amend. IV.

3. In the absence of a warrant issued upon probable cause, law enforcement officials may only search a person or his property pursuant to consent.  <u>Davis v. United States</u>, 328 U.S. 582, 593-94 (1946).  The Fourth Amendment permits a search conducted pursuant to valid consent.  <u>Katz v. United States</u>, 389 U.S. 347, 358 (1967).

4. The government has the burden of proving by a preponderance of the evidence that consent given to search property was freely and voluntarily given.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973); <u>United States v. Velasquez</u>, 885 F.2d 1076 (3d Cir. 1989).

5. "[W]hether a consent to a search [is] in fact 'voluntary' or [is] the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  <u>Schneckloth</u>, 412 U.S. at 227.

6. Two competing concerns exist when determining whether consent given to a search was valid: "the legitimate need for such searches and the equally important requirement of assuring the absence of coercion."  <u>Id</u>.  Where law enforcement officials lack probable cause to arrest or search, "a search authorized by a valid consent may be the only means of obtaining important and reliable information."  <u>Id</u>.  Under the Fourth Amendment, however, consent may not be coerced "by explicit or implicit means, by implied threat or covert force."  <u>Id</u>. at 228.

7. When law enforcement officials ask a suspect to consent to a search they are not required to inform the suspect that he has the right to refuse consent, although that factor may be taken into account in determining the totality of the circumstances.  <u>Id</u>. at 232-33.

Additionally, officers are not required to inform the suspect that he is free to leave at any time. Ohio v. Robinette, 519 U.S. 33, 39-40 (1996).

8. In considering whether consent to a search was voluntarily given, the court is required to determine the factual circumstances surrounding the consent, "the psychological impact on the accused, and [evaluate] the legal significance of how the accused reacted." Schneckloth, 412 U.S. at 226. In performing this function, the court may examine the demeanor of the defendant, the length of the encounter, the atmosphere of the questioning, and whether the officers made a show of force. United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994). Additionally, the court may take into account: "the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, and whether the questioning was repeated and prolonged." Id. The court also may consider a defendant's previous experience with the criminal justice system. Miller v. Fenton, 796 F.2d 598, 606 (3d Cir. 1986), cert. denied, 479 U.S. 989 (1986). Although there are a number of factors that a court can consider in reaching the determination of whether a defendant's consent was voluntary, none of the factors are dispositive. United States v. Kim, 27 F.3d 947 (3d Cir.1994).

9. In assessing whether a defendant's consent is voluntary, a court may also consider whether the consent was in the form of a written document. See United States v. Williams, 134 Fed.Appx.510, 513-14 (3d Cir.2005) ( where defendant signed consent to search form while defendant was in custody consent was valid); United States v. Barr, 454 F.Supp.2d 229, 253 (E.D.Pa.2006) (warrantless search of defendant's vehicle was constitutional because defendant voluntarily signed a written consent-to-search form after

officer advised him of his rights); United States v. Boone, 245 F.3d 352, 362 (4th Cir.2001) (citing United States v. Navarro, 901 F.3d 1245, 1257 (7th Cir.1996) (written consent to search supports a finding that the consent was voluntary)).

10. In this case, defendant alleges that he did not voluntarily consent to the searches by virtue of the length of detention and show of force exhibited by law enforcement officers. Defendant alleges that the length of detention and show of force were not reasonable or necessary under the circumstances and, therefore, invalidated his consent. With this contention, the court disagrees.

11. In this case, viewing the totality of the circumstances, the court finds that defendant voluntarily consented to the search of his person. The record demonstrates that defendant was not in handcuffs at the time he gave consent to search his person, i.e., emptying his pockets onto the roof of the car. Although initially Walker had his weapon drawn, the weapon was drawn for a mere ten seconds and was holstered by the time defendant consented to the search. The backup officers never drew their weapons. Further, at the time defendant consented to the search of his person, the officers had advised defendant of his Miranda rights. The officers interacted with defendant in a professional and courteous manner, using a regular tone of voice and calm demeanor. The length of time of the encounter between defendant and the officers at the time of the consent to search defendant's person was less than five minutes, and the questioning of defendant was not prolonged or repeated. Defendant exhibited a calm demeanor and was cooperative with the officers. Defendant did not exhibit any mental or physical handicaps that would effect his ability to consent to the search of his person and defendant's age was not such

that it would effect his ability to consent to the search of his person. Finally, defendant's background includes a prior arrest and conviction on drug charges. Although the officers did not inform defendant that he had the right to refuse consent to search his person, the overwhelming totality of the circumstances supports the conclusion that defendant voluntarily consented to the search of his person. The record is completely devoid of any indication that defendant's will was overborne at the time he consented to the search of his person. Accordingly, defendant's motion to suppress evidence related to the search of defendant's person is denied.

12. Viewing the totality of the circumstances, the court further finds that defendant voluntarily consented to the search of his vehicle. The record demonstrates that defendant was in handcuffs at the time he gave consent to search his vehicle. The length of time of the encounter between defendant and the officers at the time of the consent to search defendant's vehicle was approximately five minutes. This questioning was not prolonged or repeated. Here too, the officers interacted with defendant in a professional and courteous manner, using a regular tone of voice and calm demeanor. Defendant also exhibited a calm demeanor and was cooperative with the officers. In fact, defendant engaged in small talk with the officers concerning basketball. Defendant did not exhibit any mental or physical handicaps that would affect his ability to consent to the search of his vehicle and defendant's age was not such that it would affect his ability to consent to the search of his person. As discussed above, defendant's background includes a prior arrest and conviction on drug charges. Notably, defendant not only gave a verbal consent to search his vehicle, he also signed a written consent form. The consent form advised

        defendant, among other things, that he had the right to refuse the request to search his vehicle.  Walker read the consent form to defendant and defendant acknowledged that he understood the form and his rights.  These circumstances support the conclusion that defendant voluntarily consented to the search of his vehicle.  The written consent form is further evidence of the voluntary nature of defendant's consent to search his vehicle.  See United States v. Williams, 134 Fed.Appx.510, 513-14 (3d Cir.2005) (non-precedential); United States v. Barr, 454 F.Supp.2d 229, 253 (E.D.Pa.2006).  Here again, the overwhelming totality of the circumstances supports the conclusion that defendant voluntarily consented to the search of his vehicle.  Accordingly, defendant's motion to suppress evidence related to the search of defendant's vehicle is denied.

13.    With respect to the search of defendant's residence,  the court finds that defendant voluntarily consented to this search as well.  The record demonstrates that defendant gave two consents to search his residence.  The first consent was a verbal consent given upon completion of the search of defendant's vehicle.  At the time of the verbal consent to search his residence, defendant was in handcuffs.  The officers continued to interact with defendant in a calm, cordial and professional manner.  Defendant continued to conduct himself in a calm and cordial manner as well.  Defendant continued to engage in small talk with law enforcement officers.  Defendant did not exhibit any mental or physical handicaps that would effect his ability to consent to the search of his vehicle and defendant's age was not such that it would effect his ability to consent to the search of his person.  As discussed above, defendant's background includes a prior arrest and conviction on drug charges.  The length of time of the encounter between defendant and

      the officers at the time of the verbal consent to search defendant's residence was approximately twenty-five to thirty minutes. This length of detention is not unreasonable such that it invalidates defendant's verbal consent to search his residence. See United States v. Bell, 357 F.Supp.2d 1065, 10714 (N.D.Ill.2005) (consent to search after having been in custody for approximately five hours was voluntary given lack of credible claims of threats or intimidation and defendant's experience with the criminal justice system).

14. The length of detention at the time defendant gave his written consent to search his residence, especially in light of the prior verbal consent, did not itself invalidate the consent. Following defendant's verbal consent to search his residence, defendant was transported, in handcuffs, to his residence and asked to sign a written consent to search his residence. The consent form provided that "I have not been threatened, nor forced in any way" and "I freely consent to this search." Defendant signed this consent form after Walker read through the document with him. Defendant acknowledged that he understood the form and his rights and signed the consent form. This action was consistent with his prior valid verbal consent to search his residence, which had been given approximately thirty minutes after he was stopped by the police officers. As noted above this written consent form is evidence of the voluntary nature of defendant's consent. At the time defendant signed the written consent form to search his residence he had been detained for approximately one hour and fifteen minutes, and had been in handcuffs for approximately one hour and ten minutes. By itself, the use of handcuffs does not invalidate defendant's consent to search his residence. See, e.g., United States v. Watson, 423 U.S. 411, 424 (1978) (custody alone is not by itself enough to demonstrate a

coerced consent to search); United States v. Boone, 245 F.3d 352, 363 (4th Cir.2001) (where defendant was handcuffed, his will was not overborne and consent to search was voluntary). Instead, the court must consider the totality of the circumstances. See United States v. Kim, 27 F.3d 947 (3d Cir.1994).

15. At first blush, one might consider that United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir.1994), addresses the issues present here. On closer analysis, the court finds that Melendez-Garcia is not applicable. In Melendez-Garcia, the United States Court of Appeals for the Tenth Circuit analyzed the legality of a detention which was initiated pursuant to a valid Terry stop. During the detention, law enforcement officers conducted a "felony stop" related to the defendants. Id. at 1050. The "felony stop" included officers training their weapons on the defendants, ordering the defendants to throw their keys out of their car windows and exit the vehicles and requiring the defendants to walk backwards toward the officers. Officers handcuffed and frisked the defendants and placed each defendant in a separate police vehicle. There, the court acknowledged that the use of force, i.e., the use of firearms, handcuffs and other forceful techniques, does not necessarily transform a Terry stop into a full custodial arrest when the circumstances require such measures. Id. at 1052. The court found that the record was devoid of any evidence presented by the government that the law enforcement officers had reason to believe that the show of force was necessary. The court concluded that because the government failed to explain or offer any evidence to support an explanation why the officers needed to execute a "felony stop," the government failed to satisfy "its burden of showing that, under the totality of the circumstances, the intrusiveness of this seizure was

14

|   | |
|---|---|
|   | reasonably necessary for officer safety." Id. at 1053.  The court, therefore, treated the stop as an arrest and required a showing of probable cause to save the stop from illegality.  Id. |
| 16. | In United States v. Perea, 374 F.Supp.2d 961 (D.N.M.2005), the court considered a set of facts similar to the facts of this case.  There, law enforcement officers ordered the defendant out of his vehicle at gunpoint during a Terry stop.  The officers handcuffed the defendant and placed him in the back of a police car.  After defendant was in custody for approximately twenty minutes, the officers asked him for permission to search his vehicle.  The defendant permitted the officers to search his vehicle and the officers discovered illegal narcotics.  Defendant moved to suppress the evidence on the ground that his consent was not voluntary.  In reaching a contrary conclusion, the court distinguished Melendez-Garcia from the facts present in Perea.  The court acknowledged the testimony of police officers who testified that they had a reasonable belief that their safety was in danger.  Id. at 975.  Police officers believed that defendant's vehicle was previously used in a narcotics transaction and was possibly wanted in connection with a homicide investigation.  The court found that the facts present there justified the officers' show of force during his detention.  Id. at 977. |
| 17. | Here, law enforcement officers testified that defendant was seen leaving a known stash house, in a car that had a Texas license plate, less than one hour before a controlled purchase of narcotics.  The confidential informant had previously informed officers that the source of supply for the cocaine was from Texas.  The search warrant executed at the stash house yielded more than six kilograms of cocaine.  Defendant was seen leaving his residence with a large plastic garbage bag.  Defendant was handcuffed only after an |

officer recognized defendant as having previously engaged in and been convicted of illegal narcotics trafficking. It is well-known that individuals engaged in the sale of illegal narcotics are often armed. See, e.g., Muscarello v. United States, 524 U.S. 125, 132 (1998) (noting the dangerous combination of drugs and guns). One officer had his firearm drawn for approximately ten seconds and then ultimately handcuffed defendant in the front. Finally, officers advised defendant that he was being handcuffed for officer safety. Unlike in Melendez-Garcia, the record here is clear that law enforcement officers had a reasonable belief that the use of force shown in the instant matter was necessary in order to promote officer safety. Accordingly, the court finds that the officers reasonably acted when taking the intrusive measure of handcuffing the defendant. The court, therefore, turns to the facts considered regarding the nature and circumstances surrounding defendant's written consent to search his residence.

18. In the case *sub judice*, among the facts considered were 1) defendant continued to engage in a cordial, calm and professional manner with the officers; 2) the record is devoid of any indication of threats or other intimidating behavior by the officers; 3) defendant was advised of his constitutional rights; 4) defendant consented both verbally and in writing to the search of his residence; 5) defendant never attempted to withdraw his consent to search his residence; 6) defendant did not exhibit any mental or physical handicaps that effected his ability to consent; and 7) defendant has previous experience in the criminal justice system. Based upon these facts and considering the totality of the circumstances, the court finds that defendant's consent to search his residence was voluntary. Accordingly, defendant's motion to suppress evidence related to the search of defendant's

residence is denied.

### III. Conclusion

For the foregoing reasons, defendant's motion to suppress evidence found as a result of the searches of his person, his vehicle and his residence is denied.

                                              By the court:

                                              /s/ Joy Flowers Conti
                                              Joy Flowers Conti
                                              United States District Judge

Dated: June 20, 2007

cc:     Counsel of Record